On behalf of Ms. Richter, Mr. Daniel, Dexter J. Evans, on behalf of the L.A. Mr. Kenneth Florey. Thank you. Mr. Evans. May it please the Court, Counsel. We're here for a trip and fall accident that happened on a sidewalk deviation back in March of 2009. I'm just going to briefly go into the facts that I think are pertinent for this argument. My client, Glenn Richter, was a student at College of DuPage. She was on her way to a class at the Student Resource Center at College of DuPage. And it was an area where she was walking into as a heavily trafficked area. Like 5,000 people, I think, per day was the testimony. And she was entering before a revolving door. You had to go through the revolving door to get into the building. As she's going towards the revolving door, she trips on the sidewalk deviation and is injured. Now, the college had an unwritten policy of repair that was discovered through discovery. And basically what it was was they would spray paint. If they had notice of a deviation, they would spray paint it yellow. And then they would follow up the thawing spring after the thaw, the spring thaw, and level it, repair it, whatever they wanted to do with it. I thought they put up cones sometimes. Sometimes, yes. They also put up cones sometimes as well. So what we figured out during discovery was that prior to this incident, student Benton, an employee of the college, had given notice to the college that there was the sidewalk deviation there. And she wasn't exactly sure about when she gave the notice, but she said it could have been as early as 2007. And the trial court agreed that that was a question of fact as to whether the college became and had notice of the deviation back in 2007. Could she remember which director or chairman she had given it to? Because wasn't there a change in department head at that point? Correct. She remembered speaking with, I think his last name was Stevenson. Then there was some, I know that the college was arguing that Hornsey would have been the person that she, but her recollection, I think, was a Stevenson guy. I don't know if I got his last name exactly right, but that's what she recalled. So all of the deviation we're here for today was not repaired until 2010. So going out of the facts that are in the light most favorable to plaintiff, it was three years before this deviation was repaired, after the college became aware of it. So the big question is, is the college immune? And the college has claimed immunity under Sections 202 and 2109 of the Tort Immunity Act. And we're obviously arguing that, no, this is a ministerial duty to repair this sidewalk deviation under 3102A of the Tort Immunity Act. So the first thing I wanted to address is 3102A. And under 3102A, there is a duty for public entities like the college to repair and keep their streets and sidewalks safe. In a case that was actually cited by counsel, Kennel v. Clayton Township, the Kennel court actually enunciated it and said, yes, there's a duty, maintenance of sidewalks is a ministerial duty for public entities. So there's a duty there. I don't think anybody's going to argue that there isn't. And the college, I think, has conceded that there's a ministerial, that's a ministerial duty for a public entity like the college. So the main question of fact is, was painting the sidewalk deviation yellow in 2007 and not doing anything for three years exercising ordinary care? That's the question of fact that we're arguing is present in this case. And actually the trial court agreed that there was a question of fact when we had hearing on motion for subject judgment, but there was a question of fact with respect to whether the college exercised ordinary care in waiting. What was the height differential between the prominent or promontory that your client tripped over? There was testimony that was between an inch and an inch and a half. Was there testimony that might have been a half an inch too? I don't recall that, Your Honor, but I do recall that most of the testimony was focused on it being an inch or inch and a half. And again, looking at the facts in the light most favorable of the plaintiff, for purposes of a motion for summary judgment, if there's testimony that the deviation could have been an inch and a half, then that's the facts that we're looking at. So the college cited Catalonic's brief as a case that basically says that, no, we're entitled to immunity and 3102A is not being disturbed by applying 2202 and 2109. The difference I would point out in Kennel is that they weren't analyzing the case under 3102A because they were talking about removal of a rise in a roadway. They weren't talking about whether a sidewalk deviation or a problem with the street needs to be addressed. And they specifically noted that it's the municipality's ministerial duty to keep their streets and sidewalks in a safe repair for public travel. So they were trying to determine the separate issue of whether a removal of a rise in a roadway is something that a public entity is required to do. And they analyzed the statutes. They noted that there is no statute or there's no provision on the Tort Immunity Act placing that responsibility upon a public entity. Are you claiming that the issue of discretion isn't applicable here? Yes. We're claiming that, and that actually goes into my next point. When you look at Section 3102A. Why isn't it applicable here if, in fact, they had a policy and they exercised it? Because the policy they enunciated was, and that will go into an argument I'll come up with later, but their policy was to paint it yellow, repair it after the spring thaw. They didn't follow that policy, which there's case law that says if you didn't follow your policy, then that can be looked at as not fulfilling ordinary care. But if you look at 3102A, it talks about the prerequisites for when a public entity like the college is going to be liable. It says acceptance, and I think the first sentence is very important. It says acceptance otherwise provided in this article. So it's already saying, all right, then the rest of this. Is COD liable because they breached their policy or violated their policy or because in breaching their policy they were guilty of willful and wanton misconduct or reckless disregard? We're arguing that a COD is liable because of 3102A, which says that they have a duty of exercising ordinary care to repair the defect in a reasonable amount of time once they become aware of it, and that's what 3102A speaks of. It talks about an area that has intended and permitted users, which we have in this case. It's a student at the college. It's a place which is foreseeable for this type of use to continue to be used. And it says it shall not be liable for injury unless it is proven that actual or constructive notice of the condition to the college, well, to the public entity that it is not reasonably safe in a reasonably adequate time prior to an injury. So basically what the statute is saying is that a public entity like the college is not going to be liable unless you show that they had notice of this condition and they didn't address it or repair it within a reasonable amount of time once they became aware of the condition. Now, the college argued in its brief that we're basically saying that they should have developed a different policy on how to address sidewalk deviations, and we're not actually arguing that. The college, if we were here attacking the college and saying, you know what, you should paint it pink, not yellow, or something of that nature, clearly we would have discretion. I mean, we can't argue against that. But we can, and they can be held liable for just simply painting it yellow and then not addressing it for three years. I think under 3102A, if you look at that as whether they met their duty under ordinary care, I think if you look at that, there's a question of fact whether waiting three years to repair it or do anything to it other than just spray paint it is a question of fact as to whether that amounts to ordinary care. But didn't Benton also indicate that there was some repair to the area she had called about at some point? I don't recall that she ever said that there was some repair. I know that she says that it was spray painted, and I know there was testimony. There's actually a lot of, even the trial court noted that nobody even really knows what the color of the deviation was on the day of the accident. There wasn't really a clear set of facts or evidence as to whether it was faded or not, and that kind of goes into the open and obvious. But essentially you're relating the fall that we know the specific date of, your client's fall, back to the call Sue Benton made sometime in 2007 or 2008. Correct, correct. And there's no evidence that you found anywhere in discovery that that area had been repaired after that call? Correct. There's no evidence that we're aware of that that was ever fixed, ever repaired, and I think the college would have meant that what was done was it was painted yellow and eventually repaired. And we know it was repaired in 2010. What we don't know for certain is when Sue Benton made that call, but she said it could have been as early as 2007. So the eventually repair is after your client's fall? Correct. It was, so the fall obviously happened in March of 2009, so the repair wasn't made until spring of 2010, so it was a year later. Now, the policy was to put up cones first, right? Yes. Then to paint it so that people would see it. Yes. Right? And then to repair it. Yes. But there's nothing in the policy as to when the repairs have to be made. Correct. Or how they have to be made. Correct. And that is left to the discretion of whoever the supervisor of buildings and grounds or whatever, correct? Correct. Doesn't that make it discretionary? It does not, and the reason why I'm arguing that it does not is if that were the law, if a college or any public entity could just simply say, we'll get to it when we want to, two years, five years, 20 years, then 3102A would mean nothing because as long as the college never, if the college never addressed it, they'd never be liable for the sidewalk deviation. So where is the duty to keep your streets and sidewalks in safe repair if you're not required to do it within a reasonable amount of time, especially when it says under the statute shall not be liable for injury unless it is proven in an actual constructive notice that it was not reasonably safe in a reasonably adequate amount of time to have taken measures to remedy or protect against the condition? Thank you. Now, some of the cases that we cited in our brief I think are very analogous to the instant case. One of them in particular is Horton v. City of Ottawa, a third district case where a motorcycle, a person on a motorcycle hit a large pothole on the city street like the college is doing here. The city in that case claimed immunity under sections 2202 and 2109. The court stated in its opinion that essentially what the public entity in that case was doing was trying to abrogate 3102 with 2202, and they said they couldn't do that. And they distinguished the repair of streets and sidewalks from instances, other instances in which immunity is specifically delineated under the act. For instance, 3103 for a plan or design of improvement, 3104 for the failure to provide traffic signals and signs, 3106 parking playground property, 3107 roads or trails providing access to recreational areas, and 3108 failure to supervise use of property. Each of these sections says no liability for a public entity for anything that involves this. You're a man. If you compare that to 3102A where there is an actual duty enunciated, you can see the differences and you can see why the Horton court came to the conclusion that it did. Counsel, can we go back and revisit what Justice Spence talked about, which is isn't this an abuse of discretion and you responded no, but then you started using terms like reasonableness and the unreasonableness of never having to address it at all. Now, whether it's reasonable or unreasonable, I can accept that argument. But whether or not it hypothetically does or doesn't get treated within 5 or 10 or 15 years seems to be speculative. And so my, or the conundrum that I'm attempting to resolve is if it's an exercise of discretion, how do we determine whether or not there's liability? Is it based upon the unreasonable exercise of discretion in the formulation of the policy? Is it the unreasonable implementation of the policy? Or is it based upon some sort of statute of limitations or requirement that any and all defects have to be resolved within a period, a certain period of time? And if it isn't within a time certain, is it a time reasonable or a reasonable time? And do you edify and enlighten me? I'll certainly try, Your Honor. And I'll say this. The case, I will say that the law on tort immunity, I think it's still evolving and I don't think there is a clear indication that anybody can look at as a black line rule as far as what everybody's supposed to do. But I think when you look at 3102A, it's very significant that it talks about once you become, once you have notice of a defect, you have a reasonable amount of time to, you're going to be held liable for an injury that occurs on your property if you haven't done something about it within a reasonable amount of time. And whether you act with ordinary care is a question of fact for the fact finder to decide, not to be decided by the trial court on motion for summary judgment or barred because of the Tort Immunity Act. Because 3102A would basically just have no bite to it. It would just be a blanket, a blank statute. I think I'm out of time, right? Any other questions? No. Thank you. You have an opportunity to rebuttal. Mr. Flory? Yes. May it please the court, counsel. Good afternoon. My name is Ken Flory. I'm the attorney for the College of DuPage. There is a fine line between strong advocacy, zealous advocacy, and destroying the record. And I don't, this is probably the first time I've said this in a law argument, the record has been severely distorted, factually. Plaintiff misrepresents that it took three years to fix this defect. That's just not accurate, not consistent with the deposition testimony. It distorts, this three-year window is created, artificially created, by attacking and distorting when COD received notice of the defect and then when the crack was repaired. Briefly, I just would like to talk about the environmental and physical phenomena that we're dealing with here and the conditions of COD. We're talking about the movement of the sidewalk squares. I know many of you justices have been in COD. There are dozens of squares throughout the 200 acres of the campus. These are random occurrences. Every winter season, it's the same phenomenon, same environmental conditions. When the ground freezes, it pushes pressure on the sidewalk slabs, and they're going to move. You don't know which slab is going to move. You don't know when they're going to move, and they may move back. They may come up a week later, and they may come down. One slab may tilt up, and then another slab is going to tilt up next to it or down the street or wherever. It's a phenomenon not just facing COD, but facing any property owner with large concrete walkways. It's a big checkerboard, if you would envision it, and each square could be moving up, down, randomly, predictably. It's all over the place. It's tough to deal with when you've got the number of 5,000 people per day walking in this area. And that explains why, at least for purposes of this argument, that there may be a period of waiting until everything thaws out, whenever that may be, to see what repairs itself and what needs to be manually repaired. Absolutely, and we heard today. Plaintiff doesn't really attack our policy, and the policy is when you receive notice, the first thing you do is you put the cones out, which occurred. There's no dispute the cones were put out. The next thing you do is you paint the highway yellow reflective paint. That will show brightly in daytime, show brightly at nighttime. You paint this whole area so it becomes a warning sign, open, obvious condition to the pedestrians. Look out. Pay attention. There's something, safety hazard, you may be approaching. And the college did that. Now, did someone, and maybe, I think, Gyshen, who is? Phil Gyshen, yes. Gyshen, who has some risk management responsibility? He's the director of risk management. Okay. Did, I mean, did he say that after the call from Benton came that this action was taken, or did he know, or could that ever be documented? Everybody, all the witnesses, there is no testimony disputing the plaintiff's dispute that the cones went up and that it was painted. When Benton called, not when his client fell, but before. Correct. His client fell after Benton's phone call. Right. So Benton's phone call, employee in the human resources department, we're proud of employees like this. We like employees that point out. She didn't fall. She just said, you know what? That looks like it could be an issue. Can you address it? That starts the train going of put the cones up, paint it, and then let's see what happens after the winter's over. So she makes the call, and it's an 08. The evidence is all. She made the call on 08. The only reason he can distort the record to try to shift it to 07 was her speculation about what was the name of the director at the time of your call. And she says, I think it could be Tom Stevenson instead of Chris Corns, the new guy. That speculative fact, that would not even be admissible in the hearing, is not enough evidence to show, or even put a question of fact, when you have all the other witnesses saying that it occurred in 08, to shift the notice to 07. So that's really the critical piece. You can't shift it. It's not an 07 notice. Now, after the counsel's client falls, they're going to follow this same policy again. But is there some testimony that that area already had some indication of yellow paint on it? No, the yellow paint did not occur until after the notice by Sue Benton. So Sue Benton gives notice, cones go up, it's painted, and then we have the fall. Unfortunate accident. Nobody likes to see anyone injured. I know, but I think there's something in the record that indicates that Mr. Gyshin thought that the yellow paint was applied to the sidewalk after plaintiff fell, but then reviewing some photographs, it looked like there had been yellow paint already there at the time of the fall. There was yellow paint at the time of the fall. Do we know when that went on there? When the paint went on? The photographs. What are those photographs revealed? Those are the public safety photographs the day of the fall, right immediately after an incident. So they showed the reflective photographs. There was some yellow paint there. Yes, absolutely. Was it worn off? Was it bright? What was the issue? It was a condition that they would expect it to be in after a couple months. Okay. It was installed. The report was in the fall-winter. They put the cones, they painted, it goes through the winter season, and then she falls. The next wild chase that plaintiff wants you to go on is to look at what happened after the fall. That's not relevant. The question is, the policy, and let me finish the policy for a second. The policy was after the spring came, that spring you re-examine the crack, and you make a determination. Did it drop back to normal, or is corrective action needed? There is testimony that they took the corrective action in that spring of 2009. You have Chris Quormzy testifying that we ramped it. We put concrete trough, ramped it so it now became not a defect, not an issue. And then in 2010, which is the other distortion, they ground it down a year later. So we've got this work order. We're ordering the grinding equipment. That's the record he's looking at. But you have the testimony that he's completely ignoring and distorting that it was ramped the following spring. Corrective action was taken. So the college had a reasonable policy. He's not even arguing that policy's not reasonable. And they acted according to the policy in the same season that the policy required them to act. So all of the discussion, torn immunity, discretionary, was it like the case where the bike fell through the sewer grate? It's not a case that we had 10 years of a defect and then there was an injury. We had notice, remedial steps, injury, repair. After the injury, the college did repair it after the injury as was their normal process. But whether they waited 10 years, that would only be relevant if someone was injured after that 10-year period. That's a really important concept. We've got to stop looking for liability purposes what happened after the fall. It's remedial, subsequent remedial steps. You can't be invisible. That's not the analysis. And when you do focus the analysis and you read the record as it is, you find out that it was a reasonable college policy to handle an environmental phenomenon. It's required by 3102. Reasonable not only for a public body but for a private entity as well. This is what you do when you have property problems. And the college followed its policy, period. So you're saying within three or four months this was remedied? Correct. But you don't really get to that. Because the fall occurred before the normal remedy time period would come up, we're not legally supposed to look at what you do after the fall. But for a, listen, is the college getting away with something here? Is this a ridiculous policy they're not following? It's important to discuss. They followed it, and the record supports them following it. There's ample evidence based on decades of experience by the college personnel that this is the appropriate way to handle the sidewalk movement phenomenon. Again, the point is it's not even attacking the reasonableness of that policy. You have the four witnesses that all talk about exactly what I've been telling you, Sue Benton, Phil Gieschen, Brian Schecht, and Chris Kornje, that the notice and repair occurred in the same season, in the fall. And then the fall is in the season of the fall, and then the accident and then the repair. Because the plaintiff doesn't refute the reasonableness of our policy, the trial court ruled for the college that it was appropriate. It's not a case about the college failure to follow its reasonable policy. And after the facts are correct, it's really a straightforward case. The case falls apart when you take the factual distortions out. And the college's repair policy was reasonable and satisfied 3102 of the Tort Immunity Act. So which do we apply first, 3102 or? I can't remember the number. You have to start with 3102 because that's the duty. You have to maintain your property. 3102 says you're going to be treated like a private property owner. You don't get special treatment when it comes to your property conditions. You have to keep them in reasonable repair. Then, so that takes you to, okay, did you act reasonably? Well, you had a policy, private or public. It was a policy and a reasonable way to handle this issue. You followed the policy. Wait a minute. I'm sorry. Finish. That's the end of the Tort Immunity Act discussions because we acted reasonably. You get into the, if we were, if there was an injury because they mispainted or they made a discretionary decision in the spring, they looked at it and said we're not going to grind this or we're not going to ramp it, and there was an injury, that's where discretion comes into play. But all these different factual scenarios are not our facts. Our facts are really straightforward. Corrective action, accident, end of discussion. You don't need to get into the what ifs because the plaintiff wants you to go down that rabbit hole. The what ifs, what if this occurred, what if they waited one year or three years or ten years to make the repair because we don't have an accident after that period of expiry. Is the size and weight of the square have an effect on the cost of maintenance? I don't believe the record has any testimony in that, and I don't believe that's so. They're all fairly uniform squares. What I'm getting at is there are squares and then there are squares, and you can have squares that are like six by six or six feet by six feet. When I said six by six, I meant inches. And so when you start talking about grinding down something, if it's a six inch by six inch square, you might just consider removing it or picking it up, digging out whatever it was that supposedly created the imperfection and then placing them back down. So in the context of the situation, it would seem to me that the size and the weight of the squares would have an impact on what would be considered a reasonable way of treating the problem. Yes, I agree. That's a good solution. I haven't heard on the record yet, though it may be in the briefs, the size and the weight of these squares. You said there were 200 of them, but you didn't say whether or not they were 10 feet by 10 feet and weighed 2 1⁄2 tons or something like that. Yes, there is no evidence that we've got photos that show fairly uniform. It does look like a checkerboard at this part of the campus. But whether the business decision of is it cheaper to grind down, is it cheaper to ramp it, the number one concern is to make it reasonably safe, regardless of cost. You've got to make it reasonably safe. So can we achieve that reasonably safe standard by ramping it? Yes, but that may not be a permanent fix because the ramp may deteriorate. We can grind it down, which they did after the ramping in 2010, or we can just cut it out, jackhammer it out, and replace it. That's all going to be driven by cost, really not issues in our case. So how big were the squares, do you recall? Well, the square sizes typically depend, you don't want cracking. So typically it's maybe, it was 4 feet, 4 1⁄2 feet from the crack to the revolving door. So that's going to be from here to there. The squares were a little smaller than that, maybe 4 by 4-ish. I'm really telling you based on what I've seen and what's on the record. But you're not going to find testimony about the size of the squares. And as far as case law that we cited, the Warbler versus Chicago where the city wasn't liable, that's probably the closest one where you have a cold mix pothole scenario. You can't, during the winter, you can't bring out, the asphalt plants aren't open, and you can't bring out the steam rollers. So they use a, you know, we all get it on our cars, the cold mix that comes up, and it's not a permanent fix to that condition. And the court held they were not liable. Same situation again, reasonableness. When you're dealing with winter conditions, you can act reasonable, and you can't create perfect conditions. And as long as you consistently follow that, which Devin supports, you're not going to have liability, private or public. Thank you. Thank you. Mr. Evans? I'm sorry. Can I just add? Yes. This whole thing probably would kick me if I didn't do this because the site, the record site is important about the ramping that occurred in the spring of 2009. It's the Cornesie Deposition, page 38 to 39, record C494-495. That's where it shows the question by Mr. Ginsburg of did you, you took these steps in this time sequence. Thank you for that. Mr. Evans? As I have throughout this entire briefing, these cases at the summary judgment level and also in front of this court, I still am trying to figure out under the college's interpretation of the Tort Immunity Act when they would ever be liable under 3102A. There simply would never be any liability if they simply chose never to address the condition or repair it. Well, in fact, there are lots of cases that, while they don't relate specifically to sidewalks, there are cases that say if you don't have a policy and you don't do anything, you're not going to be liable. Well, I have to be honest. I haven't seen those specific cases. Well, they come with a lot of township cases, road cases, stop signs down. We don't put the stop sign back up because we don't have a policy about the stop sign. And what's interesting about the stop sign is that that was something that Horton pointed out in that case, or that Horton Court pointed out, saying that when they're trying to distinguish 3102A sidewalks and streets from other things, they talked specifically about traffic signals and signs, and said that's something that a city or township is immune from, or a public entity is immune from. But what we're talking about here is we're talking about something that a they have to make sure that if they have notice of a condition, that they repair it within a reasonable amount of time. Exercise ordinary care. Did they exercise ordinary care? And even if you assume, let's assume for purposes of this, that it was a discretionary thing. Once they go about putting their plan into effect, their policy into effect, that's ministerial. And so they initially put cones up, but when the plan fell, there were no cones up. And who knows how bright the yellow markings were. The trial court judge said that there wasn't any good evidence as to what the color of the yellow markings were. There were no cones up. So is that a violation of their ministerial function, if we're assuming that their decisions on what to do were all discretionary, or if they're going to do anything? Because ultimately that's what we're saying in this case if we're adopting the college's argument, is that they never have a duty as long as they do nothing. And that's not, it's an affirmative duty. It's not a, well, you know, if so-and-so duty. It's an affirmative duty to keep your streets and sidewalks in safe repair. I want to mention Sue Beck really quick. They distorted the facts a little bit by saying that it's kind of, we're saying that we, just based on who she told where we're coming up with this 2007 thing, she specifically testified that it could have been as early as 2000, or as far back as 2007. That's under C-326 in the record. So she specifically testified to that. We didn't invent it. They're stuck with her testimony. What if her testimony was irrelevant because she wasn't the one that reported this? If, as you point out, it was done and she reported it in 2007, and this paint was there in 2009, then maybe they didn't have knowledge of the obstruction because based upon their policy, it could easily have occurred that come the spring of 2008, they looked at it and it had receded back to its original position. And apparently they don't have a policy about removing reflective paint. So maybe they should reflect on that. But the argument that you're raising creates other questions, which is if she wasn't the one, then maybe they weren't put on notice, unless you can establish that it's a new coat of reflective paint. Right. And I suppose, Your Honor, if that were the facts, we would have a pretty difficult task ahead of us, and I don't think we'd probably even be standing in front of Your Honors right now. But what we do have is we do have that testimony and we do have notice. So we have questions of fact in this case that should break through the summary judgment. And there is case law. I wanted to address this really quick. In Guttstein, they talk about, of course, talk about when a city has a policy and they don't follow through with their policy, they fail to follow through with their policy, then they're putting the policy into effect, that's ministerial. And quite frankly, in this case, you could even look to the college and say, you know what, you didn't put your policy into effect. If she reported in 2007 and you didn't repair it until 2010, then your policy failed. You didn't adhere to your ministerial duty. So if we lose on tort immunity, which I still don't think we should under 3102A, we win on the fact that they fail to do their own policy, which is ministerial at that point. Counsel said, if I remember, and I was trying to do a timeline so I could look at it later, that there was the 10th, they did a ramp up in 2009 when the spring came, after your client fell. They then revisited that in 2010. Are you saying that they didn't do anything in 2009 after your client fell? Well, they didn't do anything of significance. But even if, I guess that is relevant, because even if it wasn't, let's say that they did everything after she fell. After the fact stuff doesn't really matter. The fact is they didn't follow the policy. If you rely on the facts and the light and most favorable to the plaintiff, she might have reported in 2007. We have to look at that because that's the light and most favorable to us for summary judgment purposes. If she reported in 2007 and they didn't repair it, let's say, until 2009, they still fail because they should have done it in 2008 according to their own policy. If she did report it in the fall of 2008 and the unsettling had already started, there had been some thaws, just like we've already, I don't think we've had a heart freeze yet, but the ground's been hard and then the next day you step in it and you go up to your ankle. We've had a couple of those days. If she called in 2008, the fall of 2008, your client fell in March, I think it was March 12th, and they then fixed it with the ramp at their first, when they thought they could do it early in the spring, are you saying that they didn't follow their policy? I'd say under 3102, Your Honor, it still is a question of whether they were acting with ordinary care. I'd say it would be a more difficult case for us because, you know, that's not a long period of time. If those are the facts, if those are the uncontested facts, the fact of the matter is those are uncontested. There's a question as to whether she reported in 2008 or 2007. She doesn't know for sure, but she admitted it could have been 2007, and she remembers reporting it to someone that wasn't even working there in 2008. So they're stuck with that testimony for purposes of this. But even under 3102A, I still don't think, well, I'm sorry, not 3102A, but if you ignore the fact that 3102A applies, you still get to the fact that, yes, under that situation, if it was 2008 they reported it and then they did it in 2009, then they were following their policy. But we have evidence here that they didn't follow their policy. Any other questions? No. Thank you. Thank you. We'll take the case under advisement. Court is adjourned.